Isaiah WEBB, Plaintiff,

v.

DISTRICT OF COLUMBIA, Defendant.

Civ.A. No. 90–2787 (RCL).

United States District Court,
District of Columbia.

Sept. 16, 1999.

Lisa A. Bell, Alan S. Block, Assistant Corporation Counsel, D.C. Office of the Corporation Counsel, Washington, DC, for defendant.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the Court after remand by the Court of Appeals "for further consideration of less onerous sanctions" for the defendant District of Columbia's and its counsel's misconduct during this litigation. Upon consideration of the Court of Appeals' decision, defendant's Motion To Govern Further Proceedings on Liability, plaintiff's opposition, defendant's reply, and the record in this case, the Court will reinstate its prior entry of default in this matter and order further proceedings on the issue of appropriate remedy.

## I. BACKGROUND

This is a Title VII action. Plaintiff alleges that he was discriminated against on the basis of race and sex with regard to several positions to which he applied within the D.C. Department of Corrections (DOC); he also alleges that he was terminated in retaliation for complaining about the discrimination that he suffered. The details of plaintiff's allegations and the procedural history of this case have been set forth previously by this Court, see Webb v. District of Columbia, 864 F.Supp. 175 (D.D.C.1994); Webb v. Government for District of Columbia, 175 F.R.D. 128 (D.D.C.1997), vacated by Webb v. District of Columbia, 146 F.3d 964 (D.C.Cir.1998), and by the Court of Appeals, see Webb, 146 F.3d at 967–70. The principal facts relevant to today's decision can be summarized as follows: [1]

After several years of litigation in which plaintiff appeared pro se and filed a number of amended complaints, this Court denied in part and granted in part defendant's motion to dismiss the case or, in the alternative, for summary judgment. See Webb, 864 F.Supp. at 179. Counsel was subsequently appointed to assist plaintiff in his prosecution of the

Michael L. Martinez, Melinda Burrows, Theodore W. Small, Jr., Lynn Estes Calkins, Bradley D. Wine, Marc E. Miller, Holland & Knight, Washington, DC, for plaintiff.

---

1. This factual account is largely a summary of the factual description included in the Court's August 4, 1997 memorandum opinion. See Webb, 864 F.Supp. at 179.

case, and the parties proceeded to a second and final round of discovery. On November 18, 1996, this Court issued an order stating that discovery would close on January 24, 1997 and that trial would commence March 24, 1997. On several subsequent occasions, the Court expressed to the parties in no uncertain terms that the trial date was firm and would not be continued.

On December 3, 1996, defendant responded to plaintiff's first request for production of documents (which was served on defendant October 30, 1996). Rather than give complete responses, the District indicated in eleven instances that "it had forwarded the request to the appropriate agency for documents responsive to [the] request." At a status conference held December 6, 1996, defense counsel conceded that such responses were not sufficient under the Federal Rules of Civil Procedure, and the Court ordered the parties to meet and confer in an attempt to resolve that and other issues relating to inadequacies in the defendant's responses. Based on the insufficient responses and other discovery problems that had already arisen, the Court's December 6, 1996 order also extended the discovery deadline one month, to February 24, 1997, in order to accommodate the District and avoid prejudice to the plaintiff. On December 18, 1996, the parties agreed that the defendant would supplement its responses to the request for production of documents. However, throughout December and into January, no supplemental response was forthcoming from the District.

In early January, just weeks before the close of discovery, the defendant's supplemental responses began to trickle in to plaintiff. On January 13, 1997, defendant responded to plaintiff's second set of interrogatories. In addition, several District employees were subpoenaed to produce documents at their depositions; at least some of the documents produced at the depositions were responsive to the plaintiff's earlier discovery requests but as yet unproduced.

On or about January 16, 1997, two and one half months after the plaintiff's first document request, defense counsel alerted plaintiff's counsel for the first time that some relevant documents relating to the case, including portions of plaintiff's personnel file, may have been destroyed. Upon plaintiff's request, the District submitted a declaration from D.C. personnel management specialist Karen Adams on February 4, 1997 stating that all "temporary records" had been removed from plaintiff's personnel file and destroyed in preparation for storage at the federal records center. The District also submitted a declaration from D.C. Office of Personnel Supervisory Personnel Management Specialist Joan Murphy stating that, in accordance with District policy, all merit case files [2] would have been destroyed two years after filling the relevant vacancy. Ms. Murphy stated that she had informed defense counsel of the destruction of the merit case files "immediately" upon receipt of the request for documents relating to three positions at issue in this case. No explanation was given, however, then or subsequently, for defense counsel's failure to inform the plaintiff and the Court of this destruction before late January—early February of 1997.

On January 27, 1997, plaintiff moved to compel full and complete responses to their discovery requests and for sanctions. The Court granted the motion on March 1, 1997, ordering the District to provide full and complete responses to plaintiff's discovery requests no later than March 6, 1997, and to provide the Court with written confirmation of compliance. The Court also granted plaintiff's motion for sanctions, stating that the appropriate sanction would be determined at a later stage. Finally, the Court granted plaintiff's motion to take depositions of District representatives pursuant to Federal Rule of Civil Procedure 30(b)(6).

On February 4, 1997, while the motion to compel was still pending, the District proffered Joan Murphy to testify as a Rule 30(b)(6) deponent on issues relating to vacancy announcements 89–125 and 90–167, in-

---

**2.** "Merit case file" refers to a file containing all information produced during the process of an-

nouncing and filling a vacancy.

cluding the qualifications of the ultimate selectees. Despite her 30(b)(6) status, Ms. Murphy was unable to testify to the procedures for selecting among the candidates listed on the selection certificate prepared by the Office or Personnel. She could not authenticate relevant documents, nor give other substantive testimony beyond that contained on the face of the documents. At the deposition, defense counsel acknowledged that Ms. Murphy was not the proper 30(b)(6) witness to testify to many of the items included on plaintiff's notice of deposition, but maintained that the District knew of no other witness who could adequately testify and that it would proffer such witness if he or she came to its attention. There is some dispute over whether defense counsel's representations were accurate, but in any event no adequate witness was proffered until after the close of discovery and just two weeks before the commencement of trial.

On March 6, 1997, the defendant provided supplemental responses to plaintiff's discovery requests as ordered by the Court. However, the District failed to provide the Court with written confirmation as required by the March 1, 1997 order. Equally frustrating, the defendant improperly objected to the requests in several regards, despite the Court's prior granting of the motion to compel. Moreover, although defendant was by this time aware of the destruction of numerous documents relating to plaintiff and his claims, no mention of such destruction was made in the District's responses to plaintiff's discovery requests.

The March 6, 1997 supplemental responses did bring to light a number of matters, however. For instance, the defendant identified Earthel Foster for the first time as someone involved in the selection process for one of the positions at issue.[3] The District also disclosed new details regarding the 89–125 position, including that interviews had been conducted, even though the previous responses had suggested that no interviews were conducted.

On March 13, 1997, eleven days before trial was scheduled to begin, plaintiff took the deposition of Karen Adams pursuant to Rule 30(b)(6). Plaintiff's 30(b)(6) notice of deposition requested, in relevant part, a witness to testify to the District's retention or destruction of personnel records relating to plaintiff's employment at the DOC.[4] Ms. Adams could not testify to when the District began to look for plaintiff's personnel file nor to who conducted the search. However, she did testify that a personnel file had been located, but that it had been processed for removal to the federal records center. Referring to her February 3, 1997 declaration, Ms. Adams testified that the personnel file contained no "temporary records," which apparently had been removed as part of the processing for storage. Although Ms. Adams could not testify to plaintiff's personnel file specifically, she stated that temporary records typically included requests for personnel actions, evaluations, position descriptions and data sheets, official letters of reprimand, and other documents potentially relevant to a discrimination claim. When questioned about District policies for retention of documents, Ms. Adams was unaware of the federal regulations governing retention of documents pertaining to discrimination claims, including 29 C.F.R. § 1602.31.

Finally, at a status conference held March 19, 1997, five days before the start of trial, defense counsel admitted in open court for the first time that portions of plaintiff's personnel file, as well as the entire merit case files, had been destroyed. On March 20, 1997, the Court announced that it would enter a default judgment against the District for its discovery abuses and destruction of critical documents. The defendant moved

---

**3.** Defendant argues that plaintiff should have known that Ms. Foster was involved. Even if plaintiff should have known, however, the "we don't have to disclose because the other side should have known" defense has never prevailed and reflects either an ignorance or a disregard of the discovery structure established by the Federal Rules of Civil Procedure.

**4.** Rule 30(b)(6) provides that a 30(b)(6) witness "shall testify as to matters known or reasonably available to the organization," in this case the District.

for reconsideration, which was denied August 4, 1997.

Accompanying the August 4, 1997 decision was a memorandum opinion setting forth the Court's reasons for imposing a default judgment against the District (rather than less severe sanctions) as required by the Court of Appeals case law on court-imposed sanctions for misconduct by parties and their counsel. *See Webb,* 175 F.R.D. at 145–48. Nevertheless, the Court of Appeals vacated the decision and remanded for that "further consideration of less onerous sanctions." [5] *See Webb,* 146 F.3d at 976. It is that consideration which the Court undertakes today.

## II. LAW AND APPLICATION

■ The Court of Appeals held that this Court did not adequately consider sanctions less severe than default, or at least that the Court failed to adequately explain its reasoning in concluding that a default judgment was an appropriate sanction for the District of Columbia's misconduct in this case. *See Webb,* 146 F.3d at 976 n. 23. Although the Court cannot hide its frustration at being required to provide yet another explanation of its decision, which was explained at length in August of 1997, the Court will undertake to better articulate why a default judgment is the only appropriate sanction in this case. To the extent that the August 1997 memorandum opinion failed to set forth every minute detail of the Court's reasoning, the Court can only remind itself that what is painfully evident to the trial court does not always shine forth with the same clarity from the appellate record.

### A. *Source of Court's Authority*

■ Before embarking on its analysis, the Court will clarify one point apparently misunderstood by the Court of Appeals. The Court's power to sanction misconduct in this case clearly emanates both from the Federal Rules of Civil Procedure and from the Court's inherent powers. The Court of Appeals incorrectly stated that the Court's pow-

er under the Federal Rules of Civil Procedure in this case was limited to redressing the District's failure to comply with a court order explicitly requiring that the defendant provide the Court with written confirmation of its compliance with a time-sensitive discovery order. *See Webb,* 146 F.3d at 973 n. 16. While the Court does not consider this failure to be insignificant, the Court notes that it was just one of a number of violations of discovery orders by the Court. For example, although the court-ordered supplemental responses were timely served on plaintiff, they included improper objections, despite the Court's order, and were still inadequate. Several responsive documents subject to the Court's order were also provided separately and untimely in connection with depositions of involved individuals. The District also failed miserably in its duties under Rule 30(b)(6) to proffer witnesses capable of testifying to "matters known or reasonably available to the organization," as the District itself conceded. This conduct is likely sanctionable under Rule 37(d) even absent a court order, but the Court notes that the deposition of Ms. Adams was authorized by the Court's March 1, 1997 order, making Rule 37(b)(2) applicable. Thus, contrary to the Court of Appeals' suggestion, this Court's power to sanction the District's misconduct is based in the rules of civil procedure as well as in the Court's inherent powers.

### B. *Standard for Imposing Default as a Discovery Sanction*

In any event, as the Court of Appeals noted, the appropriate standard under either the rules of civil procedure or the Court's inherent powers is essentially the same. Before focusing on the *Shea* standard applied by the Court of Appeals in this case, the Court feels duty-bound to review a number of other relevant precedents addressing the appropriateness of default judgments as sanctions for discovery misconduct.

---

**5.** The Court of Appeals also instructed the Court to consider "after-acquired evidence" proffered by the District suggesting that plaintiff would have been terminated for sexual harassment later

even had he not been terminated in 1994. Because this evidence goes only to the issue of remedy, it is not discussed here and will be the subject of further proceedings.

### 1. Deference to the Trial Court

The district court's power to sanction discovery abuses with an entry of default was recognized by the United States Supreme Court in *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976). In that case, the Court upheld the district court's default judgment under Rule 37 for the respondent's failure to respond timely or adequately to interrogatories. Addressing the appropriate deference to the district court's determination, the Court wrote:

"There is a natural tendency on the part of reviewing courts, properly employing the benefit of hindsight, to be heavily influenced by the severity of outright dismissal as a sanction for failure to comply with a discovery order. . . . But here, as in other areas of the law, the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent."

*Id.* at 642–43, 96 S.Ct. 2778.

This deferential standard was adopted by the Court of Appeals for this Circuit. Judge Starr described the appropriate review in *Founding Church of Scientology of Washington, D.C. v. Webster*, 802 F.2d 1448, 1457 (D.C.Cir.1986):

"That is, needless to say, a rule of appellate restraint, a principle faithful to the reality that appellate tribunals cannot hope to have the entire range of considerations as readily at hand as the court charged with the case in the first instance. We rightly pay great deference, as the abuse-of-discretion standard itself suggests, to the District Court's determination in such instances. Implicit in the governing standard is the recognition that the trial court has a better 'feel,' as it were, for the litigation and the remedial actions most appropriate under the circumstances presented. . . . The abuse-of-discretion standard calls upon the appellate department, in a spirit of humility occasioned by not having participated in what has gone before, not just to scrutinize the conclusion but to examine with care and respect the process that led up to it."

*See also Weisberg v. Webster*, 749 F.2d 864, 870 (D.C.Cir.1984) (noting that "the Supreme Court's warning in *National Hockey League* against too much leniency 'has special significance in the case of interrogatories which are supposed to be served and answered without the need for judicial prompting'"). Then–Judge Ruth Bader Ginsburg stated this principle in another way in *Bristol Petroleum Corp. v. Harris*, 901 F.2d 165, 167 (D.C.Cir. 1990):

[I]f district court judges are to discharge their heavy case processing responsibilities effectively, 'their power to dismiss . . . must be more than theoretical.' Authority to dismiss and other sanctions have been entrusted to the district courts to enable district judges to discharge efficiently their front-line responsibility for operating the judicial system. Appellate courts, accordingly, should be hesitant to type the exercise of a district court's dismissal authority as an abuse of discretion."

(Internal citations omitted.)

The Court of course recognizes that the Court of Appeals has found sanctions of dismissal or default to be unduly harsh in a number of cases. However, the lesson of those cases appears to be that dismissal or default is not an appropriate sanction for a single instance of misconduct or for conduct that does not evidence any bad faith, willful misconduct, or tactical delay. *See Trakas v. Quality Brands, Inc.*, 759 F.2d 185, 187–88 (D.C.Cir.1985).[6] Consequently, those cases

---

6. It may be noteworthy that the majority opinion in *Trakas*, which found that the district court had abused its discretion, has been called into question by at least two of the nation's leading jurists. *See Trakas*, 759 F.2d at 188 (Scalia, J., dissenting); *Newman v. Metropolitan Pier & Exposition Auth.*, 962 F.2d 589, 591 (7th Cir.1992) (Posner, J., for the court) (*"Trakas* does not take seriously either the responsibility of district judges for the management of their busy calendars or the burden on defendants and their lawyers of having their schedules disrupted by plaintiffs who do not play by the rules.").

are distinguishable from the instant case, in which the defendant's illegal document destruction was widespread and willful and Corporation Counsel's recalcitrance and silence were both ongoing and knowing.

### 2. The History of Discovery Sanctions Against the District of Columbia

Of particular note are the numerous cases in which this Court has found dismissal, default, and other severe sanctions to be appropriate responses to the ongoing difficulties encountered by the courts in litigation to which the District of Columbia is a party. For example, this Court found default to be an appropriate sanction for the District's willful failure to comply with discovery orders in *Monroe v. Ridley*, 135 F.R.D. 1 (D.D.C.1990). In that decision, nearly nine years ago, the Court was forced to note that "the sanctions this court has imposed upon defendant in previous litigation have failed to ensure his compliance with discovery orders." *Id.* at 6 (citing and discussing *Covington v. District of Columbia*, No. 87–2658 (D.D.C. Feb. 26, 1990) (slip op.)). Not two weeks after the *Monroe* decision, the Court again was forced to default the District of Columbia for discovery abuse in *Jackson v. District of Columbia*, 1990 WL 174943 (D.D.C.1990). The Court again vented its frustration at the dilatory tactics of the District and Corporation Counsel; not for the first time, and unfortunately not for the last.

Less than half a year after *Monroe* and *Jackson*, Judge Hogan also lamented the

District and Corporation Counsel's misconduct, including the failure to adequately respond to interrogatories. *See Green v. District of Columbia*, 134 F.R.D. 1 (D.D.C.1991). Comparing the misconduct in the case with this Court's opinion in *Monroe*, Judge Hogan observed that the "defendants' dilatory tactics have become part and parcel of their litigation techniques." *Id.* at 4.

Even this outcry by the district court, however, was insufficient to encourage the District and Corporation Counsel to mend its ways. In *Neal v. Director, D.C. Department of Corrections*, 1995 WL 517248, at *2 (D.D.C. Aug. 9, 1995), this Court explained that Corporation Counsel's misconduct, in particular the failure to adequately respond to an interrogatory, had required that the Court preclude the defendants from offering fact witnesses at trial. Although the Court declined to impose a default and set forth in considerable detail its basis for imposing the sanction that it did, the Court of Appeals overturned the jury verdict returned in the case and remanded the case to the Court for new proceedings. *See Bonds v. District of Columbia*, 93 F.3d 801 (D.C.Cir.1996).[7] Unfortunately, if not altogether surprisingly, the effect of the Court of Appeals' decision in *Bonds* seems to have been to instill in Corporation Counsel a certain arrogance and a belief that the District of Columbia plays by different rules than those applicable to other litigants. That was certainly the attitude displayed by the defendant and Corporation Counsel in this case,[8] and the Court of Ap-

---

7. The Court would note the opinion of Judge Tatel, with whom Judges Wald and Sentelle joined, dissenting from the denial of rehearing en banc in *Bonds*. *See Bonds v. District of Columbia*, 105 F.3d 674 (D.C.Cir.1996). With all due respect and recognizing that the Judges wrote in dissent, this Court's view is that Judge Tatel was correct when he wrote: "Appellate courts must use great caution in overruling district judges in the way they run their courtrooms lest they undermine the basic authority of district judges to control the proceedings before them." The behavior of the District of Columbia, particularly since the Court of Appeals' decision in *Bonds*, is striking evidence of the wisdom of this warning.

8. This attitude manifested itself in a number of ways. Not the least of those ways was the defendant's complete failure to *propose* any specific and meaningful corrective instruction or eviden-

tiary presumption to remedy the prejudice that its actions had caused to plaintiff. Rather than accept responsibility for its actions and those of its client, the Office of Corporation Counsel protested, argued, and insisted that the Court should impose no sanction whatsoever. Even after the Court of Appeals remanded the case, the Corporation Counsel raised this argument. In essence, the Corporation Counsel felt that it could ignore its own misconduct and force the Court to spend precious resources trying to divine a way to remedy the prejudice caused by its behavior. The unmistakable message from Corporation Counsel to the Court was that the defendant was unconcerned with the Court's frustration and unwilling to timely participate in the Court's efforts to see that justice was fairly administered. The Corporation Counsel stated at the final pretrial conference on March 20, 1997, that "[We] are prepared to offer alternative adverse infer-

peals' remand no doubt has reinforced that perception of special status. It is in this context that the Court must revisit its decision to impose a default judgment for the District and Corporation Counsel's misconduct in this case.

### 3. The *Shea* Standard

 As the Court of Appeals directs, this Court will be guided in its review of this case by the standard articulated in *Shea v. Donohoe Construction Co.*, 795 F.2d 1071 (D.C.Cir.1986). The Court of Appeals in *Shea* identified three factors that might support a default judgment as a sanction for misconduct. First, the district court may conclude that the other party's ability to present its case has been " 'so prejudiced by the misconduct that it would be unfair to require him to proceed further in the case.' " *Webb*, 146 F.3d at 971 (quoting *Shea*, 795 F.2d at 1074). Second, the court could find that the potential prejudice to the judicial system justifies default if the misconduct has placed "an intolerable burden on a district court by requiring the court to modify its own docket and operations in order to accommodate the delay." *Id.* (quoting *Shea*, 795 F.2d at 1075). Third, "the court may consider the need to 'sanction conduct that is disrespectful to the court and to deter similar misconduct in the future.' " *Id.* (quoting *Shea*, 795 F.2d at 1077). Although the Court of Appeals has rightly stated that the sanction of default should be used only when less onerous sanctions would be inadequate, the Court of Appeals has declined to require that a district court exhaust other sanctions before imposing a default judgment. *See id.* The Court of Appeals requires only that the district court explain its reasons for resorting to default rather than a less severe sanction,

such as an award of attorney's fees or adverse evidentiary rulings. *See id.* at 971–72.

### C. *Prejudice to the Plaintiff*

The first *Shea* factor addresses the degree to which the misconduct at issue has prejudiced the other party's ability to litigate his case. The Court of Appeals noted in its decision in this case that there are two circumstances that generally may support default as a sanction for misconduct under this first *Shea* factor: (1) where the destroyed document is itself dispositive of the case and (2) where the misconduct involved " 'such wholesale destruction of primary evidence regarding a number of issues that the district court cannot fashion an effective issue-related sanction.' " *Id.* at 972 (quoting *Shepherd v. American Broad. Cos.*, 62 F.3d 1469, 1479 (D.C.Cir.1995)). The Court of Appeals suggested that neither of these circumstances were present in this case. The Court must respectfully disagree.

The Court of Appeals appears to consider the destroyed documents from plaintiff's personnel files irrelevant to his discrimination claim because personnel files are ordinarily not consulted during the selection process for filling vacancies. What the Court of Appeals did not consider, however, is that the plaintiff is alleging precisely the kind of action by the District that does not proceed according to blackletter policy. Not a single witness testified that plaintiff's personnel file in fact was not consulted in the selection process for the vacancies at issue. More important, plaintiffs alleging discrimination should not be forced to prove their cases based on the defendants' choice of files and records. It is not at all inconceivable that plaintiff's personnel file may have contained records [9] with the

---

ence in jury instruction if the Court directs us to do so ... [but][w]e left it out from the joint pretrial statement because we weren't certain where the Court would go." Tr. at 78. The Court's order of October 18, 1996, specifically required all proposed jury instructions to be submitted with the pretrial statement. *See* October 18, 1996 Order at 4. The Corporation Counsel then argued that not only was a default inappropriate, but any adverse inference would also be inappropriate. Later at the pretrial conference, the Corporation Counsel proposed that the Court should only consider the adverse inference question after the jury had heard all the evidence, and

that the Corporation Counsel now wanted additional time to present a draft and brief the question. Tr. at 105. This pompous disregard for the Court and its responsibilities is further justification for the Court's entry of default against the District.

**9.** The Court of Appeals was incorrect in its assertion that the only "temporary records" relevant to plaintiff's claims would have been Corrective/Adverse Action Final Decision Letters and Official Reprimands. Evidence of discrimination could have appeared in requests for personnel or

type of derogatory remarks that suggest discrimination on the basis of race or sex and that regularly provide the bases for liability verdicts in Title VII cases. Separate and apart from plaintiff's retaliatory discharge claim, in which context the importance of the destroyed documents should be apparent, plaintiff's discrimination claims could have been practically won with documents from his personnel file. Of course, neither plaintiff nor the Court will ever know if such a "smoking gun" document existed, but that is not the fault of the plaintiff and he should not be forced to bear the burden of the District's illegal destruction of documents and inexcusable delay in bringing the destruction to light in this litigation until too late.

This case also presents the second circumstance of the first *Shea* factor—where the destruction of primary evidence is so pervasive that the court cannot fashion an effective alternative sanction. Both the defendant and the Court of Appeals suggest that an alternative to default in this case might have been the authorization of continued discovery by plaintiff. However, even ignoring the prejudice to plaintiff's preparation for trial (or a prejudicial delay), this suggestion misses the point that plaintiff should not be forced to reconstruct through circumstantial evidence what he was entitled to receive from the defendant in discovery. Even to the extent that plaintiff could notice depositions of persons thought to have first-hand knowledge of the contents of the files, such testimony would unlikely be as effective as the documents themselves. Memories fade over the course of extended litigation, and the defendant had already proven itself incapable of proffering competent witnesses (at least in a timely fashion).

■ The Court of Appeals, in its decision in this case, also suggested that adverse evidentiary inferences may have sufficed to remedy the defendant's misconduct in this case. Again, the Court of Appeals overlooks several important considerations. First, the function of sanctions for misconduct need not

be solely remedial. The Court of Appeals has recognized and approved of the punitive aspect of sanctions for party and attorney misconduct. *See, e.g., Shepherd,* 62 F.3d at 1476 ("[M]ost inherent power sanctions, including default judgments, are fundamentally punitive."). Therefore, the Court need not tailor its sanction precisely to remedy the narrowly defined product of the misconduct, so long as the Court is mindful of the preference for decisions on the merits.

Second, adverse inferences and court instructions are necessarily "second-best" evidence for a plaintiff's case. Although the Court can and does expect a jury to accept its instructions and apply them dutifully, the Court is not blind to the important intangible aspects of evidence, particularly in jury trials, and particularly in cases alleging discrimination, retaliation, and related injuries of a less-than-concrete nature. In this case, for instance, had the personnel or merit case files contained a discriminatory remark in the handwriting of a subsequent or contemporaneous decisionmaker, the weight of such evidence in the jury's eyes could be expected to be greater than that of an instruction from the Court.

Third, the potentially critical information that could have been contained in the destroyed files or elicited from witnesses (if timely and appropriately identified) covered such a broad range that the Court would have been forced to fashion a large number of adverse inferences to protect the plaintiff from undeserved prejudice. In addition to the "diminishing returns" that numerous evidentiary instructions could be expected to receive from a jury, there must be a point when the instructions in a case have so supplanted the proposed or expected evidence that the court is not obligated to waste precious judicial resources in a trial.

The Court of Appeals, in *Shepherd,* distinguished a prior case that had upheld the dismissal of an action for misconduct, *Weis-*

disciplinary actions, evaluations, or other records contained in the file. The Court of Appeals was also incorrect in its assumption that plaintiff would necessarily prefer to assert that no corrective action or official reprimands were in his file.

On the contrary, if plaintiff could discover evidence of discriminatory adverse actions or reprimands, his case would obviously be substantially strengthened.

berg v. Webster, 749 F.2d 864 (D.C.Cir.1984). In distinguishing *Weisberg*, the Court of Appeals said: "At issue in *Weisberg* was a plaintiff's willful and repeated refusal to comply with an order requiring him to respond to the defendant's discovery requests concerning information that went directly to the merits of the case." *See Shepherd*, 62 F.3d at 1480. This description matches precisely this Court's findings in this case. The Court of Appeals continued: "Moreover, the plaintiff's recalcitrance in *Weisberg* had entirely halted the discovery process and frustrated the defendant's ability to litigate its case. Although the alleged alteration of the memorandum in this case [*Shepherd*] did cause a major disruption and waste of judicial resources, it need not have unduly delayed the case." *Id.* Again, the case currently before the Court closely resembles the Court of Appeals' portrayal of the appropriate dismissal in *Weisberg*. The pervasive combination of illegal document destruction and unreasonably reticent discovery practice in this litigation effectively prevented the plaintiff from litigating his case. Furthermore, it precipitated an unacceptable circumstance in which the plaintiff was forced to either seek substantial last-minute discovery and forego meaningful preparation for trial or proceed to trial without critical evidence. The only other option was to seek a continuance of the trial, which plaintiff did not want and which the Court was simply unwilling to grant as an accommodation of the District's grossly irresponsible behavior. Faced with the prospect of such unjust delay, the Court determined that it would not permit such prejudice to the plaintiff and that some sanction of the defendant was both necessary and appropriate. After careful weighing of the options, the Court concluded that a default judgment was the only sufficient sanction.

### D. *Prejudice to the Judicial System*

With regard to the second factor of the *Shea* test, the Court of Appeals has stated:

"Where the delay or misconduct would require the court to expend considerable judicial resources in the future in addition to those it has already wasted, thereby inconveniencing many other innocent litigants in the presentation of their cases, our precedents have held that dismissal may be an appropriate exercise of discretion." *Shea*, 795 F.2d at 1075–76. In particular, the Court of Appeals in *Shea* stated various "presumptions," including "a relatively bright-line test according district courts wide discretion in determining how detrimentally their schedules need be altered for delinquent counsel ." *Id.* at 1076. In this case, there can be little question as to the applicability of the Court of Appeals' language in *Shea*. Defendant's document destruction coupled with defense counsel's misconduct would have required the Court to scratch a trial date that had been planned well in advance and communicated clearly as firm. Additional discovery to remedy the prejudice caused to the plaintiff, if possible, would have required a second and substantial extension of the discovery deadline and doubtless would have required the continued supervision and arbitration of the Court. Moreover, in this case the defendant had demonstrated that it was either unwilling or unable to provide complete and timely discovery to the plaintiff, and the Court had no reason whatsoever to think that its orders would force an adequate response from the District where prior orders had been ineffective.[10] It should also be remembered that when a court is forced to vacate a trial date so close to the commencement of trial, the prejudice to other litigants is greater than usual because it is too late for the court to insert another trial or make other beneficial use of the trial time originally allocated to the vacated trial.

Even if the Court could conceivably have rearranged its schedule to make room for continued discovery and a later trial, it would be simply absurd to require the courts to disrupt the administration of justice in order

---

10. The Court of Appeals' suggestion that the time remaining before trial gave the Court "room to maneuver" is simply unreasonable. Given the breadth of the evidence at issue, it would have been a harsh injustice to force plaintiff to take the substantial additional discovery that would have been necessary and also submit new pretrial statements, prepare for another pretrial conference, and prepare for trial in just three weeks in a case with such a voluminous record, which had been pending since 1990.

to accommodate irresponsible misconduct by a party and its counsel. The Court of Appeals has agreed in principle, but it seems unwilling to agree in application, at least where the District of Columbia is concerned.

Before proceeding to the next factor, the Court feels that it should emphasize one additional aspect of the prejudice caused both to the Court and to plaintiff by the District and Corporation Counsel's behavior. The Court of Appeals suggests that this Court may have abused its discretion by failing to manufacture some set of instructions and adverse inferences to cure the prejudice caused by the defendant. However, this is *not* a case in which the Court has rejected a reasonable proposal by a party, nor any specific or meaningful proposal at all. Before this case went to the Court of Appeals, the District and Corporation Counsel never proposed any specific written set of instructions or adverse inferences to cure the prejudice that their actions had created. As noted above, *see* n. 8, this violated the Court's pretrial order. Defendant expected this Court to fabricate on the spot some curative mechanism to save the District from its own misconduct. By vacating the default judgment entered by this Court, the Court of Appeals has once again demonstrated to the District and the community that the District of Columbia and the Office of Corporation Counsel enjoy an elevated status, in which they are permitted to engage in misconduct without fear of any real consequence.

### E. *Deterrence and Punishment*

The final justification recognized by the Court of Appeals in *Shea* was the need to deter future misconduct, a goal which the Court of Appeals called "clearly legitimate." *Shea*, 795 F.2d at 1076. The Court finds that this deterrence rationale applies to both the District's destruction of documents and defense counsel's recalcitrance in the discovery stage of this case.

First, the Court is less eager than the Court of Appeals to dismiss the value or necessity of default as a deterrent to future document destruction by the District. The Court of Appeals notes that the District alleged on appeal to have taken "steps" to "alert District of Columbia employees as to their obligations under federal regulations to preserve employment records." *Webb*, 146 F.3d at 975. Whether or not these "steps" amount to the change in policy clearly required by the federal regulations is unclear, but the Court has little confidence that even this action would have been taken had this Court not sent a strong signal to the District that its refusal to adopt federally mandated procedures to facilitate discrimination claims would not be tolerated. The Court of Appeals recognized and reiterated the seriousness of this unlawful activity, but concluded that it alone could not warrant default.

While the Court of Appeals' willingness to give the District the "benefit of the doubt" might be reasonable if the District had no history of misconduct, the history of litigation misconduct by the District and its representatives before this Court cannot and must not be ignored. Separate and apart from the misbehavior of Corporation Counsel, the District itself has proven to this Court on a number of occasions that it is oblivious to any but the most severe sanctions. In the *Bessye Neal* litigation, (Civil Action No. 93–2420), for example, District officials violated this Court's injunctions so blatantly that the Court was obliged to find several of them in criminal contempt. Nearly five years later, the Special Master in that case still has occasion to recommend findings that high-level District officials be found in contempt of court. The District of Columbia is like a spoiled child—whatever sanctions this Court imposes, the District simply cries over the punishment and then turns around and misbehaves again.

Although the Court may disagree as to whether the District's illegal document destruction alone could support default, it is not necessary to belabor the point here, because of the additional need to deter attorney misconduct such as that seen in this litigation. The Office of Corporation Counsel's unreasonable delay and general unwillingness to disclose the destruction of documents represents the kind of litigation approach that this Court must be concerned with deterring. As this Court's decisions in *Covington, Monroe, Jackson,* and numerous other cases amply

demonstrate, litigation misconduct by the Corporation Counsel is not a new phenomenon. Unfortunately, despite the efforts of the district court to sanction and deter such behavior, decisions by the Court of Appeals in *Bonds* and other cases have led to a feeling both within the Corporation Counsel and among the plaintiffs' bar that the District and its attorneys will not be held to the same standard of conduct demanded of other parties and attorneys in this jurisdiction. The Court of Appeals appears either blind to this unfortunate perception or willing to condone it. With all due respect, this Court, however, will not apply such a double standard, in this case or in any other, unless specifically directed to do so by the Court of Appeals.

The Court will address one additional issue that deals both with deterrence and with an inherent weakness in issue-related sanctions. Issue-related sanctions can sometimes be ineffective insofar as they present the perpetrator of misconduct with a skewed risk-benefit choice, as follows. Assume for the sake of argument [11] that a defendant had in fact examined a plaintiff's personnel file and found a document containing racially or gender-based discriminatory remarks. In this scenario, the heavy presumption in favor of issue-related sanctions would provide the unscrupulous defendant with a substantial incentive to discard the inculpatory document, because one of two results would be likely to flow from such action. In the best case scenario (from the defendant's perspective), the destruction of the document might never come to light in litigation or perhaps would be considered insufficiently important to warrant sanction. In this best case scenario, the defendant gets away with something. Even in the worst case scenario (again from the defendant's perspective), however, the destruction of the document will result only in an evidentiary inference that the remark existed. Because the remark did in fact exist, the defendant has lost nothing. The clear incentive is to destroy evidence. Granted, plaintiff has demonstrated no such bad faith behavior in this litigation. Nevertheless, this aspect of issue-related sanctions leaves the Court less enamored of them than the Court of Appeals seems to be.

Finally, it bears noting, as well, that the principal equitable consideration articulated in *Shea*, that a party should seldom be penalized so severely as by default for the misconduct of his attorney in which he took no part and of which he was unaware, does not weigh against default in this case. The Court of Appeals may have been correct in *Shea* that the court should rarely penalize an innocent client unless he is at least aware of and fails to remedy the misbehavior of his retained counsel, with whom he may have little or no relationship outside of having hired them to provide representation in the case. The situation of government or in-house counsel, however, is decidedly different from that of appointed or even retained counsel. *See, e.g., Monroe*, 135 F.R.D. at 8. A government lawyer and her client maintain an exclusive and ongoing relationship, in which the client has an unusually broad influence because of the power to control litigation policies and the entirety of the lawyer's resources. This consideration, together with the District's own unlawful actions, make the imposition of a default judgment in part for the misconduct of counsel an entirely just and appropriate result in this case.

### F. Inadequacy of Other Sanctions

Although the Court has addressed various inadequacies regarding other sanctions elsewhere in this memorandum opinion, the Court will further address the two most common, and generally the most powerful, "less onerous" sanctions.

#### 1. Issue-related Sanctions

The Court has addressed several weaknesses of issue-related sanctions, both in general and with reference particularly to this case, above. The most outstanding quality of issue-related sanctions is the high degree to which they may be tailored to remedy a particular injury caused by misconduct. While this narrow tailoring is in most respects a positive feature of issue-related sanctions and in fact responsible for the Court of Appeals' obvious preference for

---

**11.** The Court has not made a finding of bad faith in this case.

such measures over default or dismissal, it does reveal two important aspects in which such sanctions are inadequate in this particular case.

First, for the Court to tailor an effective remedial issue-related sanction, the injury to be remedied must be fairly well defined. In this case, however, the destruction of the merit case files and portions of plaintiff's personnel file have raised any number of potential issues. The destroyed documents (coupled with the reticence of defense counsel that precluded a timely resolution of the problems) have forever closed evidentiary trails that may have led to relevant or even dispositive evidence on plaintiff's discrimination claims as well as his retaliation claim. Because no one knows which documents were removed from the personnel file, evidence ranging from requests for personnel action to evaluations to official reprimands may have been lost. It is therefore exceedingly difficult if not impossible for the Court to fashion an issue-related sanction that would adequately protect plaintiff from the prejudice which the destruction potentially caused him.

Second, issue-related sanctions do not have a punitive effect and therefore do not serve the Court's legitimate interests in punishing misconduct and deterring future misconduct of the same nature. In this case, both the District and its counsel engaged in behavior that the Court must not tolerate and which should be deterred by whatever appropriate means available. For this purpose, issue-related sanctions are simply inadequate.

For these reasons and those stated above, the Court finds that issue-related sanctions are necessarily insufficient in this case.

### 2. Attorney's Fees

An imposition of attorney's fees would be insufficient in this case for essentially the opposite reason that issue-related sanctions are insufficient. Attorney's fees, although often an effective punitive measure with which to deter future misconduct, have little, if any, remedial value. Although the Court could have granted attorney's fees to cover plaintiff's cost in conducting additional discovery and litigating previous discovery disputes, no award of attorney's fees could compensate plaintiff for the permanent loss of critical evidence. An award of attorney's fees also fails to remedy the prejudice to the judicial system that results from misconduct such as that at issue here. The Court cannot reclaim the time and resources lost babysitting defendant's discovery efforts, nor could an award of attorney's fees avoid the disruption to the Court's schedule necessitated by continuing a trial date and extending discovery.

The Court finds that an award of attorney's fees would have been an inadequate sanction in this case.

### III. CONCLUSION

In conclusion, the Court finds that the imposition of a default judgment for defendant's and defense counsel's misconduct in this case was both an appropriate measure and a necessary one. Having reviewed this case and the possibility of alternative sanctions yet another time, the Court will reinstate its prior entry of default against the defendant.

The Court acknowledges that two very distinguished attorneys have recently served as Corporation Counsel. Charles F.C. Ruff, formerly United States Attorney for the District of Columbia and subsequently White House Counsel, served as Corporation Counsel from 1995 to 1997. Thereafter, D.C. Court of Appeals Judge John Ferren served as Corporation Counsel from 1997 through early 1999. Their leadership, however, has not remedied the chronic problems that have plagued the Office of Corporation Counsel since well before their tenures.

Unfortunately, excuses that the office is understaffed and without sufficient resources to meet court-imposed deadlines have continued unabated. Indeed, they seem to have reached a new crescendo as the Corporation Counsel position has been vacant with only a series of Acting heads since Mayor Anthony Williams took office, and no one has even been nominated to fill the position as of this date. Given the long history of this problem, the Court can no longer view the Corporation Counsel's lack of resources as merely an

unfortunate circumstance, but rather as the consequence of a knowing and willful decision by the District of Columbia not to provide its legal counsel with adequate resources. At some point, this ongoing refusal to fund its own legal defense ceases to weigh in favor of leniency and begins to weigh heavily in support of severe and serious sanctions against the District.

In trying to apply the standards imposed by the Court of Appeals, this Court has recently refused to enter a default judgment against the District in the case of *Bostick v. District of Columbia*, Civil Action 98–2177, and the Court hereby takes judicial notice of its own record in that case. The *Bostick* case was filed on September 11, 1998. The District failed to timely respond to the complaint, but on November 25, 1998 moved for an enlargement of time *nunc pro tunc* and lodged therewith a motion to dismiss. The Court granted the enlargement of time, but denied in part the motion to dismiss in an order filed January 27, 1999. Defendants then failed to file an answer, and this Court noted in an order filed April 27, 1999 that defendants were in default, but directed counsel to meet and confer and file proposed scheduling orders. Counsel then met and filed their Local Rule 206 Report on May 7, 1999, and the Court issued a scheduling order on May 12, 1999. Nevertheless, defendants still never complied with the Rule 12 requirement to file an answer to the complaint. On June 2, 1999, plaintiff filed a motion for a default judgment because of defendant's failure to file an answer, certifying that he had served his motion on Corporation Counsel on May 19, 1999 and still had failed to receive an answer. Corporation Counsel on June 10, 1999 opposed the motion for default judgment and moved *nunc pro tunc* for an enlargement of time until June 25, 1999 to file an answer, claiming that the failure to answer was an "oversight" and was "inadvertent and unintentional." June 25, 1999 came and went with no answer. Indeed, nothing occurred until the Court filed an order on August 12, 1999 warning defendants that it would grant the plaintiff's motion for a default judgment unless an answer was filed within ten days. On the tenth business day, an answer was finally filed by defendants. On September 1, 1999, the Court denied plaintiff's motion for a default judgment.

Moreover, the undersigned judge is not the only member of this Court to experience continued frustration with the District of Columbia and Corporation Counsel. For example, in two recent cases, Judge Friedman has expressed his own displeasure with the District's tactics. In *Barton–Smith v. District of Columbia*, Civil Action 98–3026 (D.D.C. June 1, 1999), Judge Friedman granted plaintiff's motion for attorney's fees as conceded when the District of Columbia failed to respond to the motion for over six weeks. Nearly three months after the motion was filed, the District moved to vacate the order and for an enlargement of time *nunc pro tunc* on the ground that the new attorney assigned to the case " 'needed the additional time within which to review the case and its current posture and prepare a response.' " In response, Judge Friedman wrote: "The Office of Corporation Counsel has made a habit of failing to respond to motions, appearing late for Court (when it appears at all), misplacing Court orders and notices of hearings, and failing to respond timely, if at all, to discovery requests in many cases on the calendar of the undersigned as well as in cases before other judges of this Court." The undersigned judge is in complete agreement with Judge Friedman's appraisal of the District's and Corporation Counsel's habits.

Just over one month after the decision in *Barton–Smith*, Judge Friedman again had occasion to lament the Corporation Counsel's inability to timely respond to a motion. Explaining how the District had yet again waited until weeks after an opposition was due to move for an extension of time *nunc pro tunc*, Judge Friedman referred to his *Barton–Smith* opinion. *See Blackman v. District of Columbia*, 59 F.Supp.2d 37 (D.D.C.1999). Judge Friedman also commented that "when defendants actually have filed oppositions, those oppositions generally have been short, unhelpful memoranda" arguing a position which the Court had already specifically rejected in another case. Here again, Judge Friedman's experience was not atypical of

the experience of many members of this Court.

The Court recites the histories of these cases to demonstrate how difficult it is for plaintiffs to receive their day in court when the District of Columbia is the defendant. There comes a time when it is just not fair to a plaintiff to make them endure what has to be done to try a case against the District of Columbia. In *Webb,* that point was reached where fairness and justice and a sense of decency demanded that the Court put a stop to the District of Columbia's repeated misconduct. No actions taken by the District of Columbia, before or since, have altered the Court's view that plaintiff Webb is entitled to a default judgment.

Because the parties have not yet addressed the substance of defendant's after-acquired evidence on the issue of remedy, the Court will defer ruling on that issue and order the parties to submit a proposed schedule for further proceedings on the issue of remedy.

A separate order will issue this date.

### ORDER

Upon consideration of the Court of Appeals' mandate in this case, defendant's Motion to Govern Further Proceedings on Liability, plaintiff's response, defendant's reply, and the record in this case, and for the reasons set forth in a memorandum opinion issued this date, it is hereby

ORDERED that defendant's motion is GRANTED in part and DENIED in part; and it is further

ORDERED that the default judgment against the defendant is REINSTATED; and it is further

ORDERED that the parties shall meet and confer within 15 days of this date to determine if they can agree as to what further proceedings are necessary to determine an appropriate remedy. The parties shall submit to the Court within 30 days of this date a joint report, or separate reports if no agreement can be reached, setting forth their proposal(s) for further proceedings.

SO ORDERED.